Matthew G. Berkowitz (SBN 310426)
Patrick Colsher (SBN 336958)
Caroline M. Walters (SBN 239054)
Jeff Leung (SBN 310960)
Timothy A. Trost (SBN 340843)
Alexander A. Williams (SBN 362748)
Reichman Jorgensen Lehman & Feldberg LLP
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
Tel: (650) 623-1401
mberkowitz@reichmanjorgensen.com
pcolsher@reichmanjorgensen.com
cwalters@reichmanjorgensen.com
jleung@reichmanjorgensen.com
ttrost@reichmanjorgensen.com
awilliams@reichmanjorgensen.com

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Corent Technology, Inc., <br><br>           Plaintiff, <br><br>      vs. <br><br> Microsoft Corporation, <br><br>           Defendant | Case No.: 8:25-cv-2182 <br><br> **JURY TRIAL DEMANDED** <br><br> **COMPLAINT FOR PATENT INFRINGEMENT** |

1

## CORENT TECHNOLOGY, INC.'S COMPLAINT FOR PATENT INFRINGEMENT

1.    Corent Technology, Inc. ("Plaintiff" or "Corent"), by and through its undersigned counsel, brings this complaint against Microsoft Corporation ("Microsoft" or "Defendant") to hold Microsoft accountable for its infringement of Corent's patented technology.  Jurisdiction in this Court is proper because this is a patent infringement lawsuit over which the Court has subject matter jurisdiction under, *inter alia*, 28 U.S.C. § 1331 and 1338(a). This District has general and specific personal jurisdiction over Defendant because, directly or through intermediaries, Defendant has committed acts within this District giving rise to this action; is present in and transacts and conducts business in this District and the State of California; and transacts and conducts business with residents of this District and the State of California.

2.    Defendant has infringed and continues to infringe U.S. Patent No. 11,019,136 (the "'136 Patent"), U.S. Patent No. 10,320,893 (the "'893 Patent"), U.S. Patent No. 10,305,761 (the "'761 Patent") and U.S. Patent No. 9,495,372 (the "'372 Patent") (collectively the "Asserted Patents"), directly and through intermediaries, within this District and the State of California by making, using, selling, offering for sale, marketing, designing, and/or importing in or into this District and elsewhere in the State of California, its products and services covered by claims in the Asserted Patents including, without limitation, products that, when made or used, practice the claimed methods of the Asserted Patents.

3.    Defendant's infringement, as alleged further herein has been, at least since the filing of this action, willful and in disregard of the Asserted Patents, without any reasonable basis for believing that it had a right to engage in the infringing conduct. Corent's causes of action arise, at least in part, from Defendant's contacts with and activities in and/or directed at this District and the State of California. Venue is proper in this Court under 28 U.S.C. §§ 1391 and 1400(b).  Microsoft maintains regular and established places of

business in this District and has committed acts of infringement in this District.  Corent further alleges as follows:

4.      Corent is a pioneer in a variety of cloud computing and cloud computing-related technologies that are reflected, in part, in the Asserted Patents.  Microsoft competes with Corent in various markets, and has caused, and continues to cause, harm to Corent by infringing the Asserted Patents.  Corent brings this Complaint for patent infringement under 35 U.S.C. § 271 *et seq.* for damages and equitable relief, as set out below. This civil action arises under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq.*

## INTRODUCTION

5.      Originally founded as iBijlee.com in 2000, the company was renamed Corent Technology, Inc., in 2005 when it formally solidified its focus on delivering software applications as a service more rapidly, efficiently, and cost effectively.

6.      Shafi Syed, who is an accomplished software engineer with decades of experience as a software developer, was instrumental to the formation of Corent.  Mr. Syed earned a bachelor's degree in engineering in computer science from the University of Madras in 1990.  In 1993, Mr. Syed received a master's in computer engineering from the University of Louisiana at Lafeyette.  Mr. Syed began his professional career as a software development engineer at Actel.  While at Actel, Mr. Syed developed innovative advanced technologies related to software/hardware interfaces, eventually serving as Senior Engineer of Software Development.  In 2000, Mr. Syed founded iBijlee.com, which focused on developing collaborative product platforms for web-based enterprise applications, including product applications with automatic multi-tenancy features.  During this period, Mr. Syed realized that, despite the advantages of cloud computing, uptake of cloud computing was hampered by the lack of an accessible SaaS ecosystem.  Mr. Syed realized that creating a SaaS operating system that would allow disparate applications to be adapted to cloud services providers, which each have their own architectures, hardware, software, and systems that may not be compatible with other systems, would not only promote cloud adoption but streamline the production of new software solutions.

7.      Feyzi Fatehi was also instrumental to Corent's evolution. Mr. Fatehi earned a bachelor's degree in mechanical & solar engineering from the University of Texas at Austin in 1982.  Mr. Fatehi went on to earn a master's degree in computer science from Texas State University in 1985 as a distinguished member of its Computer Science Honor Society, and later an MBA from Santa Clara University in 1992.  He began his career at the Hewlett-Packard Corporation in 1986 as a software architect and eventually became Hewlett-Packard's Director of Global Channels & Alliances.

8.      Prior to joining Corent, Mr. Fatehi was an experienced and successful engineer, inventor, thought leader, and entrepreneur.  In 1999, Mr. Fatehi helped with the formation of the startup Jamcracker.  At Jamcracker, Mr. Fatehi was the head of corporate and business development.  Mr. Fatehi and his colleagues raised over $240 million in investments, helping to make Jamcracker into the first $1 billion market cap SaaS provider. While at Jamcracker, Mr. Fatehi recognized the limitations of the then state-of-the-art SaaS systems—there was simply no standard, automated and repeatable platform available that allowed single-tenant systems to function in multi-tenant cloud environments.  Each SaaS functionality of an existing program had to be manually programmed, and there was no streamlined system for workload partitioning or orchestration.  In order to fill these long-felt needs, Mr. Fatehi joined forces with Shafi Syed and helped launch Corent to fill this market gap.

9.      Both Mr. Fatehi and Mr. Syed understood something that others in the field did not: that new systems and architectures would be required to efficiently transform from single-tenant systems to multi-tenant SaaS applications, and that, once that transformation occurred, orchestration mechanisms would be required to efficiently and strategically utilize and assign cloud resources.  Mr. Fatehi and Mr. Syed realized that the computing industry required these tools to make cloud systems work better and more efficiently.  Mr. Fatehi and Mr. Syed led Corent to help close these gaps in the cloud computing market.

10.      Since launching Corent, Mr. Fatehi and Mr. Syed have successfully brought multiple products to market, including Corent's SurPaaS MaaS, ComPaaS, and SaaSOps

systems. These systems provide innovative solutions that allow companies to, among other things, scan and analyze local applications, migrate local applications to the cloud, enable multi-tenant systems, monitor cloud resource usage, and orchestrate cloud resources.

11. Corent's products have received widespread industry acclaim. In 2008, Corent was named as the "Best Investment Opportunity" and "People's Choice" award recipient at the Harvard Entrepreneurs' Conference Fast Pitch Competition.[1] In 2012, Corent was honored as the most innovative cloud technology provider at the 19th Annual TechAmerica Orange County High-Tech Innovation Awards.[2] In 2014, Corent received the "Most Innovative Cloud Service Award,"[3] the "Outstanding Cloud/SaaS/Web Platform Solutions" award,[4] and was named a "Cool Vendor in PaaS 2014" by industry analyst Gartner.[5] In 2022, Forbes Books published a book by Mr. Fatehi entitled "Democratizing SaaS: Unleashing a Multi-Trillion-Dollar Industry by Empowering a New Generation of SaaS Entrepreneurs," which outlines Corent's mission to automate SaaS-enablement. That same year, Corent SaaSOps won the prestigious CODiE Award for Best Platform as a Service, beating the runner up in the category, IBM's Red Hat.

12. Microsoft is one of the largest purveyors of cloud computing services in the world. According to Microsoft, its annual revenue from its cloud computing business surpasses $110 billion.[6] On information and belief, a significant portion of this revenue is attributable to Microsoft's Azure and SaaS offerings, including its Azure Migration, managed Kubernetes, Azure Marketplace, and Azure SQL Database services. Migration is

---

[1] https://www.corenttech.com/images/downloads/corent.pdf (last accessed on September 19, 2025)
[2] https://www.prnewswire.com/news-releases/corent-wins-techamerica-high-tech-innovation-award-for-best-cloud-computing-product-of-the-year-159436435.html (last accessed on September 19, 2025)
[3] https://www.corenttech.com/cloudys.html (last accessed on September 19, 2025)
[4] https://octaneoc.org/hta-past-winners/ (last accessed on September 19, 2025)
[5] https://www.corenttech.com/gartner.html (last accessed on September 19, 2025)
[6] https://www.microsoft.com/en-us/investor/events/fy-2023/earnings-fy-2023-q4 (last accessed on September 19, 2025)

the gating event for many companies seeking to adopt distributed systems. To lure customers onto the Azure SaaS platform, and utilize other Microsoft products, Microsoft offers its migration services for free for the first 180 days of a user's subscription. By lowering the barrier of entry, Microsoft both encourages companies to adopt its systems (over other competing architectures) and harms smaller migration-focused software companies.



13.     On information and belief, Microsoft has adopted the same strategy for its Azure Kubernetes Services ("AKS")—Microsoft offers it for free to encourage customer adoption and reap greater benefits through correlated services and products.

14.     On information and belief, once customers are enticed to join Microsoft by the use of these free services, customers are kept within the ecosystem and use Microsoft's paid services. Microsoft's paid services, including Azure Marketplace—which enables the monetization of the Azure SaaS offerings—as well as the Azure SQL Database system—which allows for hosting and orchestration of database services for a per-unit and per-usage cost—and other cloud services, create an interconnected web of profitability driven, in part, by Microsoft's free migration tools.[7]

---

[7] https://azure.microsoft.com/en-us/blog/bring-azure-data-services-to-your-infrastructure-with-azure-arc/ (last accessed September 22, 2025)

15.     Azure Migration was first announced in 2017 and became generally available in 2018.[8]  Since its release, Azure Migration has become one of the most widely adopted migration services.  AKS was first deployed in October 2017.[9]  Since its inception, AKS has become a key portion of Microsoft's multi-billion-dollar push into the artificial intelligence computing space.[10]

16.     Azure Migrate directly competes with Corent's MaaS product.  As a result of Microsoft's infringement, as set out below, Corent has lost migration customers, many of whom would have also become customers of other Corent's products.  This has damaged Corent's bottom line, its reputation and growth potential, and delayed and limited its partnership opportunities with other large cloud providers such as Amazon Web Services.

17.     On information and belief, migration services are a key driver of Azure's revenue, because migration is the necessary first step companies must take to move from local to cloud-based services.[11]  Azure Migrate acts as the "foot in the door" for companies to switch from local infrastructures to Azure.  It also enables follow-on Azure services that Microsoft sells to Azure customers.  For this reason, Microsoft offers Azure Migrate to its customers for free for the first 180 days.[12]

18.     Managed Kubernetes services are currently growing by 23.40% per year.[13]  AKS is one of the services driving that growth.  As more of Microsoft's customers adopt

---

[8] https://techcommunity.microsoft.com/blog/itopstalkblog/azure-migrate---whats-in-a-name/1003357  (last accessed on September 19, 2025)

[9] https://blog.aks.azure.com/2024/05/21/aks-past-present-future (last accessed on September 19, 2025)

[10] https://cloudnativenow.com/features/microsoft-doubles-down-on-kubernetes-ai-integration-and-complexity-solutions-take-center-stage-at-kubecon-2025/ (last accessed on September 19, 2025)

[11] https://docs.azure.cn/en-us/migrate/migrate-services-overview?view=migrate-classic (last accessed on September 19, 2025)

[12] https://azure.microsoft.com/en-us/pricing/details/azure-migrate/ (last accessed on September 19, 2025)

[13] https://www.digitalocean.com/resources/articles/managed-kubernetes-services (last accessed on September 19, 2025)

Kubernetes based systems and frameworks, more customers have looked to Microsoft to help them store and manage their Kubernetes systems. In fact, since the introduction of AKS, Microsoft has claimed that Kubernetes usage on Azure has increased tenfold.[14]

19. On information and belief, Azure Marketplace and Azure SQL Database are effective tools for keeping users locked into the Azure ecosystem. Azure SQL Database allows users to monetize their single-tenant systems through SaaS functionality and Azure Marketplace allows users to bill clients for their actual cloud usage.

20. In sum, the Azure systems act as a one-two punch for user acquisition and monetization: the migration and orchestration services lure customers in on a free-to-use basis (effectively undercutting competition), and the Marketplace and SQL Database systems provide functionality and monetization systems for Microsoft to reap immense profits.

21. This is a successful model. Revenue from Microsoft's Azure and other cloud offerings has surged in recent years, including a 33% year-over-year growth in 2025 alone.[15] But the fundamental gating intellectual property that enables this growth was developed by Corent, not Microsoft.

22. This lawsuit is intended to stop Microsoft's unlicensed use of Corent's intellectual property.

## PARTIES

23. Plaintiff Corent is a Delaware corporation with its principal place of business located at 65 Enterprise, Aliso Viejo, CA 92656.[16]

24. Corent is the developer and owner of foundational technology used in cloud migration, orchestration, and management tools.

---

[14] https://www.sdxcentral.com/news/microsoft-touts-10x-increase-in-kubernetes-usage-on-azure-cloud/ (last accessed on September 19, 2025)
[15] https://tinyurl.com/muar4zn9 (last accessed on September 19, 2025)
[16] https://www.corenttech.com/contact-us.php (last accessed on September 19, 2025)

25.    Corent specializes in the development of SaaS infrastructure products for more efficient computing within cloud systems, including the automatic partitioning of applications and orchestration of cloud resources.  Corent's developments are designed to enable and enhance the performance of cloud systems, allow for faster development of new systems, and migrate legacy systems to the cloud at lower cost and higher efficiency.

26.    Corent is the assignee and owns all right, title, and interest to the Asserted Patents.

27.    On information and belief, defendant Microsoft is a Washington[17] corporation with one or more regular established places of business in this District, at least at 3 Park Plaza, Suite 1600, Irvine, CA 92614 and 13031 W. Jefferson Blvd, Suite 200, Playa Vista, California 90094.[18]   Microsoft may be served with process through its registered agent, CSC – Lawyers Incorporating Service located at 2710 Gateway Oaks Drive, Suite 150N, Sacramento, California 95833.  On information and belief, Microsoft has been registered to do business in the State of California since at least October 29, 1993, and has maintained offices in the State of California since at least 1981.[19]

## RELEVANT FACTS

### I.    CLOUD ADOPTION AND USAGE HINGES ON THE EFFICIENT MIGRATION OF LOCAL SYSTEMS TO THE CLOUD AND THE ORCHESTRATION OF CLOUD APPLICATIONS

28.    The advent of cloud computing has radically changed the software industry and given birth to the software as a service ("SaaS") model.  SaaS is a cloud-based software

---

[17] https://www.microsoft.com/en-us/investor/faq (last accessed on September 19, 2025)
[18] https://www.microsoft.com/en-us/hub/locations#tab-north-america (last accessed on September 19, 2025); https://download.microsoft.com/download/6/E/D/6ED449F0-BF1C-4926-81A5-A0E2D86AC14B/US%20City%20LosAngeles.pdf (last accessed on September 19, 2025)
[19] https://blogs.microsoft.com/bayarea/2025/04/03/decades-of-innovating-in-the-heart-of-silicon-valley-microsofts-deep-roots-in-the-bay-area/ (last accessed on September 19, 2025)

delivery model where people access applications over the internet, while the cloud service provider handles infrastructure, security, and updates. SaaS typically operates on a subscription basis, eliminating the need for customers to install or maintain software locally, or commit to expensive and time-consuming on-premises installation and implementation processes. SaaS applications are highly scalable and flexible, allowing customers to adjust their subscription levels as their needs evolve.

29. Multi-tenant architecture allows a single instance of SaaS software to serve multiple customers, optimizing resources and reducing costs. SaaS advantages include cost efficiency, ease of access, and workforce mobility by providing access to apps and data from any internet-connected device.

30. Common SaaS use cases span business management and operations, collaboration and communication, and data analytics and business intelligence. Future SaaS trends include greater AI adoption, the rise of low-code and no-code platforms, and a stronger focus on security and compliance.[20]

31. One of the major difficulties of creating a SaaS system is adapting legacy single tenant systems to the cloud because different cloud providers have different configurations, tools, and available resources. Migration services solve this problem.

32. However, even after a company migrates to the cloud, the company must learn how to orchestrate its applications across various cloud resources, databases, and data centers. This is difficult, as each device, machine, and data center may have characteristics that are incompatible with one another. Similarly, these cloud resources may or may not be compatible with the requirements of the application workloads and workload partitions (e.g., groupings of workloads). Orchestration systems solve these problems.

33. Both migration and orchestration systems allow for applications to be broken down into various subgroups, e.g., partitions, containers, or pods, that can be grouped together based on their characteristics, such as their compute requirements.

---

[20] https://azure.microsoft.com/en-us/resources/cloud-computing-dictionary/what-is-saas (last accessed on September 19, 2025)

34.    Generally, orchestration systems take workloads, which are a small (sometimes the smallest) unit of compute of an application, and group those workloads together into larger groups, such as partitions.

35.    This process of breaking an application down into constituent workloads is sometimes referred to as containerization.

36.    Containerization is advantageous because different workloads have different compute requirements.  By grouping like workloads together, the application sub-units may be effectively run on compute resources, such as virtual machines ("VMs").

37.    But containerization can be inefficient because if an individual container goes down, the system fails.[21]

38.    The advent of containerization has led to a need to manage containers that run applications to ensure that there is no downtime.  For instance, when one container fails, then another container needs to start.  Frameworks of distributed systems that organize container systems allow for the resilient management of distributed systems.  Orchestration of containers allows for: scaling and failover of applications, providing deployment platforms, providing storage orchestration, automating rollouts and rollbacks, and the configuration and management of sensitive information.[22]

39.    Orchestration systems, through the adoption of schedulers, have been designed to automatically match the compute needs of groups of workloads and partitions to appropriate cloud resources, and, once the workloads are scheduled, allow for monitoring of those assignments based on a variety of cloud specific factors.

40.    But schedulers are difficult to create and particularly difficult to automate. Creating an efficient scheduler requires that a system not only be able to automatically analyze workloads, partitions and cloud resources, they must also effectively match and run the workloads and partitions on the correct cloud resources in order to optimize a variety of factors including utilization (e.g., how much of the compute power of a VM is

---

[21] https://kubernetes.io/docs/concepts/overview/ (last accessed on September 19, 2025)
[22] https://kubernetes.io/docs/concepts/overview/ (last accessed on September 19, 2025)

used), efficiency (e.g., how fast the computations occur and in what order); and cost (e.g., how expensive the individual use of the VM is).

41.    However, despite the difficulty in creating schedulers, they are vital features required for orchestration systems to allow companies to grow and efficiently scale their cloud systems.  By automating and advancing assignment systems, companies can more efficiently rely on cloud systems to offer better performance, greater scalability, and lower costs.

## II.    CORENT DEVELOPED AND CREATED ADVANCED MIGRATION AND ORCHESTRATION SYSTEMS

42.    Corent is an American firm led by Feyzi Fatehi, a seasoned executive and entrepreneur, and Shafi Syed, an experienced engineer and inventor.  Both Mr. Fatehi and Mr. Syed had significant track records of bringing new and innovative products to market.

43.    Mr. Fatehi and Mr. Syed operated Corent in Orange County, California since 2005.  They raised seed funding and hired a team of engineers to help develop new SaaS and orchestration systems.

44.    Prior to Corent's launch, Mr. Syed and Mr. Fatehi, through their variety of industry roles and experiences, realized that new migration and orchestration systems were required to hasten the cloud computing revolution.

45.    Corent was started as a company that, through its research and innovation, aimed to revolutionize not only migration services but also cloud orchestration systems.

46.    To advance and commercialize new aspects of cloud computing and cloud computing architectures, the Corent team developed a SaaS system that provides an operating system for software applications that allow companies and developers to adapt their single tenant applications to a variety of different cloud providers. Importantly, Corent developed systems that allowed for no-code transformation of non-SaaS applications into cloud-based SaaS systems.  This technology makes adopting SaaS architectures easier, faster, and more efficient.

47.     The development team at Corent also anticipated the need to orchestrate workload and container management through the use of partitioning.  In particular, Corent realized that systems needed to be developed to assist in partitioning and scheduling workloads in order to both utilize cloud resources efficiently and efficiently run the workloads.

48.     The Corent team has designed, developed, and built systems that allow for no-code migration and ranking and scoring based workload mapping and orchestration.

49.     Corent's first developed system was its SurPaaS migration as a service ("MaaS") system.  The SurPaaS MaaS system was the result of years of research and development, which was documented in and is protected by the resultant '372 Patent, and the other Asserted Patents.

50.     The SurPaaS MaaS system allows customers to analyze and shift applications to the cloud within short periods of time and for customers to develop their cloud migration services.  SurPaaS Maas allows system integrators, managed service providers, and cloud service providers to set up a MaaS platform within hours and shift their customer applications to the cloud in a mostly automated fashion.

51.     In addition to effectively allowing for migration, SurPaaS MaaS allows companies to remove the element of surprise from migrating to the cloud by modeling all the factors related to the cost of operations and planning. SurPaaS MaaS allows customers to customize the migration cost for each cloud provider and compare the cost of migration between various cloud providers.

52.     Not only does SurPaaS MaaS allow for the comparison of cloud providers, it also allows for efficient cloud architecturing and the creation of an adaptive workload library.  SurPaaS MaaS creates various deployment architectures for cloud operations by analyzing application workloads and provides suggestions for possible architectures.  The suggested architectures can transform the application into a system that is elastically scalable, performable, backup-enabled, highly available, and clustered for high reliability

and cost effectiveness. Customers can also custom-build an application's deployment architecture based on Corent's SurPaaS recommendations.

53. SurPaaS MaaS provides customers with a repository which includes a collection of workload migration plans to choose from and use during cloud migration. These maps can be used to automate an application's cloud migration process, saving time and effort and creating a ready-made solution for companies seeking to migrate to the cloud.

54. Corent's research and development also resulted in the ComPaaS system. The ComPaaS system is Corent's all-in-one cloud optimization solution that empowers service providers to seamlessly support and manage their clients across multiple cloud platforms.

55. ComPaaS allows service providers to effortlessly oversee their clients' cloud accounts from one centralized dashboard. This consolidated view allows service providers to efficiently monitor, control, and optimize their clients' cloud assets. ComPaaS makes fragmented information conveniently accessible from one source, provides detailed advisories for smarter resource management, allows providers to manage user access and control permissions, and ensures that clients have the right level of control over their cloud assets.

56. Corent's years of research have also resulted in the development of commercial SaaSOps technology.

57. This technology allows for the automatic migration of a broad range of software applications to a robust SaaS model. SaaSOps also allows for the automation of previously manual operations, like subscriber onboarding and resource provisioning, and the ability to analyze, meter, and understand a company's cloud usage.

58. These features enable the streamlining of what were previously slow and complex deployment processes. But SaaSOps not only allows for fast migration, it also allows for automatic maintenance of cloud systems, granular billing options that can meter usage of cloud systems and control access and features, and continuous optimization of

14

systems that allow customers to identify areas of infrastructure evolution that can streamline operations, reduce costs, and improve performance.

59.    Overall, Corent's first-in-kind technology has significantly advanced cloud migration, cloud orchestration, and SaaS enablement technologies, and has enhanced software providers' ability to make full use of modern cloud capabilities.

60.    In September 2011, the first Corent provisional patent application was filed. Additional provisional applications were filed in 2013.  The first provisional application disclosed, amongst other things, an agile database connector that allows for single-tenant systems to be used like multi-tenant systems.  Later provisional applications described, amongst other things, methods and apparatuses that allow for no code migration from single-tenant to multi-tenant systems.  In addition to migration services, these patents disclosed the ability to automatically orchestrate workloads across partitions and cloud resources such that the workloads are ranked and mapped to cloud resources based on a ranking and scoring system.  This ranking and scoring of partitions and workloads allow for the most efficient use of cloud resources.

## III.    CORENT'S PATENTS

61.    Corent is the exclusive owner by assignment of all rights, title, and interest in the Asserted Patents.  Among other benefits, the Asserted Patents enable cloud migration and cloud orchestration.

62.    The '136 Patent, entitled "PARTITIONING AND MAPPING WORKLOADS FOR SCALABLE SAAS APPLICATIONS ON CLOUD" was duly and legally issued on May 25, 2021.  A true and correct copy of the '136 Patent is attached hereto as Exhibit 1.

63.    The '136 Patent has been in full force and effect since its issuance.  Corent is the exclusive owner by assignment of all rights, title, and interest in the '136 Patent, including the right to bring this suit for injunctive relief and damages, and including the right to sue and recover all past, present, and future damages for infringement of the '136 Patent.

15

64.    The '136 Patent claims priority to U.S. Provisional Application Nos. 62/031,712 and 62/031,679, both filed on July 31, 2014.

65.    The '136 Patent generally relates to systems and methods for the partitioning, grouping, ranking, and assigning of workloads of an application for both the effective migration of applications from non-tenant aware systems to cloud systems as well as the orchestration of workloads within the cloud system.  The method of the '136 Patent includes identifying workloads of an application based on their characteristics, partitioning those workloads as a function of that characteristic(s), further grouping the created partition of workloads into a plurality of workload sub-partitions, assigning the workloads to a set of cloud resources, constructing workload assignment maps in accordance with the created partition, and ranking each of the plurality of workload assignment maps based on a set of rules.

66.    The '136 Patent solves at least two technological problems found within cloud systems: the migration of non-tenant aware applications to the cloud, and, post-migration, the orchestration and mapping of the migrated workloads.  As described within the patents, "many applications are not well suited to a particular cloud environment" because of the "wide variety of configurations" and the inability of a system to "pair well with [an] application's requirements." '136 Patent at 1:45-47.  Additionally, "legacy applications may fail to take advantage of the additional resources offered by a cloud environment" and "applications run inefficiently in a cloud." *Id*. at 1:48-51.  The invention of the '136 Patent solves these problems by creating a new and unconventional architecture that creates and utilizes partitions of workloads.  The '136 Patent allows for non-tenant aware applications and cloud applications and systems to "effectively consider factors such as cost, scalability, performance, and security inherent in the cloud resources before" deploying the application. *Id*. at 1:60-67-2:2.

67.    The '136 Patent effectuates these goals, by, for instance, using "systems and methods that rank desirability of the permutations of workload assignment maps by some

16

user or administrator provided…rules, such as cost, efficiency, and/or scalability." *Id*. at 2:67-3:2.

68.    For example, claim 1 of the '136 Patent is directed to:

A method for configuring workloads, comprising:

identifying workloads of a non-tenant-aware application and a set of application characteristics for each of the identified workloads;

creating a partition of the workloads in reference to a partition application characteristic;

grouping the created partition of the workloads into a plurality of workload sub - partitions as a function of a common workload characteristic;

assigning each partition of the workloads to a set of cloud resources as a function of the partition application characteristic and a characteristic of the set of cloud resources;

constructing a plurality of workload assignment maps to assign to each of the workloads in accordance with the created partition, and ranking each one of plurality of workload assignment maps based on a set of rules.

69.    The '893 Patent, entitled "PARTITIONING AND MAPPING WORKLOADS FOR SCALABLE SAAS APPLICATIONS ON CLOUD" was duly and legally issued on June 11, 2019.  A true and correct copy of the '893 Patent is attached hereto as Exhibit 2.

70.    The '893 Patent has been in full force and effect since its issuance.  Corent is the exclusive owner by assignment of all rights, title, and interest in the '893 Patent, including the right to bring this suit for injunctive relief and damages, and including the right to sue and recover all past, present, and future damages for infringement of the '893 Patent.

71.    The '893 Patent claims priority to U.S. Provisional Application Nos. No. 62/031,712 and 62/031,679, both filed on July 31, 2014.

72.    The '893 Patent generally relates to systems and methods for the partitioning, grouping, ranking, and assigning of workloads of an application for both the effective

migration of applications from non-tenant aware systems to cloud systems as well as the orchestration of workloads within the cloud system.  The apparatus of the '893 Patent includes a scanning engine configured to identify workloads of an application based on defined rules, a partitioning engine configured to group workloads into smaller partitions, a mapping engine configured to assign each partition to a set of cloud resources using partition rules in a partition mapper database as defined by an individual user, and a migration engine that constructs a migration plan to migrate each of the workloads to a set of cloud resources in accordance with the assigned partitions from the mapping engine.

73.    The '893 Patent, like the '136 Patent, solves two technological problems found within cloud systems: it solves for the migration of non-tenant aware applications into the cloud, and once the programs are migrated, how to effectively orchestrate cloud resources.  As described within the patents, "many applications are not well suited to a particular cloud environment" because of the "wide variety of configurations" and the inability of a system to "pair well with [an] application's requirements." '893 Patent at 1:38-41.  Additionally, "legacy applications may fail to take advantage of the additional resources offered by a cloud environment" and "applications run inefficiently in a cloud." *Id*. at 1:42-44.  The invention of the '893 Patent solves these problems by creating a new and unconventional architecture that creates and utilizes partitions of workloads.  The '893 Patent allows for non-tenant aware applications and cloud applications and systems to "effectively consider factors such as cost, scalability, performance, and security inherent in the cloud resources before" deploying the application.  *Id*. at 1:59-61.

74.    The '893 Patent effectuates these goals, by, for instance, using "systems and methods that rank desirability of the permutations of workload assignment maps by …rules, such as cost, efficiency, and/or scalability."  *Id*. at 2:59-62.

75.    For example, claim 1 of the '893 Patent is directed to:

A system for configuring workloads, comprising:

a scanning engine configured to identify workloads of a non-tenant-aware

18

application and a set of application characteristics for each of the identified workloads using workload rules in a workload partitioner rules database defined by an administrator user;

a partitioning engine configured to group the workloads to a smaller set of partitions as a function of common characteristics of workloads in a partition using partition rules in a partition mapper rules database defined by an administrator user;

a mapping engine configured to assign each partition of the workloads to a set of cloud resources as a function of a partition application characteristic and a characteristic of the set of cloud resources, wherein each partition is assigned to a discrete cloud resource using partition rules in the partition mapper rules database as applied to a cloud resource database defined by an administrator user; and

a rendering engine that constructs a migration plan to migrate each of the workloads to the set of cloud resources in accordance with the assigned partitions from the mapping engine;

wherein the scanning engine, the partitioning engine, the mapping engine, and the rendering engine comprise stored program instructions embedded in a non-transitory computer readable storage medium, and

wherein the stored program instructions are executed by a computer processor to execute a function.

76.     The '372 Patent, entitled "MULT-TENANT AGILE DATABASE CONNECTOR" duly and legally issued on November 15, 2016. A true and correct copy of the '372 Patent is attached hereto as Exhibit 3.

77.     The '372 Patent has been in full force and effect since its issuance. Corent is the exclusive owner by assignment of all rights, title, and interest in the '372 Patent, including the right to bring this suit for injunctive relief and damages, and including the

right to sue and recover all past, present, and future damages for infringement of the '372 Patent.

78.     The '372 Patent claims priority to U.S. Provisional Application Nos. No. 61/538,687 filed on September 23, 2011.

79.     The '372 Patent generally relates to an interface between a multi-tenant database and a non-tenant-specific application instance, such that the application instance sends data access commands to the module as if it is communicating with a single-tenant database.  The apparatus of the '372 Patent includes an agile database connector configured to infer unique tenant identifiers from a tenant-aware non-application source, where the database connector has a translator and a handler, the outputs from the non-tenant aware data repository are forwarded to the application without passing back through the translator and handler, and wherein the tenant-aware non-application source is external to the non-tenant aware application and non-tenant aware data repository.

80.     The '372 Patent solves technological problems that exist when a company or system wishes to adapt a non-tenant aware (single-tenant) system to a multi-tenant system (e.g., to allow it to operate as SaaS.  In particular, such changes in use can necessitate significant amounts of programming.  The '372 Patent describes a new architecture which allows for the multi-tenant use of single tenant application without significant reprogramming of the application.  As described within the patent, when "running software on large networked environments," it is "advantageous to execute a single instance of the application on one server by multiple tenants instead of executing separate instance of the application." '372 Patent at 1:19-23.  In particular, it is advantageous to perform this connection and "transforming a single tenant application to have multi-tenant capability without significantly altering the original single-tenant architecture.  *Id*. at 2:30-34.

81.     The '372 Patent effectuates these goals, by, for instance, using a new architecture: an "interface module [that] transparently handles non-tenant-specific data access commands from an application invoked by a tenant such that the application

20

accesses data associated with the tenant without needing to be programmed to know any tenant information at all." *Id*. at 2:43-47.

82.     For example, claim 1 of the '372 Patent is directed to:

A computer processor implemented system that facilitates concurrent, multi-session use of a non-tenant aware application by first and second tenants to access at least a first non-tenant aware data repository, utilizing unique ten ant identifiers obtained from a tenant-aware non-application source, without requiring modification of the non-tenant aware application or the first non-tenant aware data repository, comprising:

an agile database connector configured to infer unique tenant identifiers from the
      tenant-aware non-application source, where the agile database connector has:
      a translator logically disposed between (a) the first non-tenant aware data
            repository and (b) the application, and configured to translate at least
            first and second non-tenant specific data access commands received
            from the application into first and second tenant-specific data access
            commands, respectively, using the inferred unique tenant identifiers;
            and
      a handler separate from the non-application source, the handler logically
            disposed between (a) the first non tenant aware data repository and (b)
            the application, and configured to pass the first and second tenant
            specific data access commands to the first data repository, respectively;
      wherein first and second tenant-specific outputs from the first non-tenant
            aware data repository are for warded to the application without passing
            back through the translator and handler, and
      wherein the tenant-aware non-application source is external to the non-tenant
            aware application and the non-tenant aware data repository.

83.     The '761 Patent, entitled "MULTI - APPLICATION SAAS METERING ENGINE" was duly and legally issued on May 28, 2019.  A true and correct copy of the '761 Patent is attached hereto as Exhibit 4.

84.     The '761 Patent has been in full force and effect since its issuance.  Corent is the exclusive owner by assignment of all rights, title, and interest in the '761 Patent, including the right to bring this suit for injunctive relief and damages, and including the right to sue and recover all past, present, and future damages for infringement of the '761 Patent.

85.     The '761 Patent claims priority from U.S. Provisional Application No. 62/031,712 filed on July 31, 2014.

86.     The '761 Patent generally relates to an accurate monitoring system that is particular to a multi-tenant system that monitors each data stream of a multi-tenant system and determines the identity of the tenant using each of the data streams.  Prior to this invention, there was no available mechanism to monitor usage on a tenant-by-tenant basis in a multi-tenant system; this patent enables the ability to measure what was previously unmeasurable by conventional systems.  The system of the '761 Patent includes a metering engine configured to monitor a plurality of data streams, an identity engine configured to identify a first user, a bucket aggregator configured to aggregate activity from the first user instances, a subscription engine configured to generate a summary of the total activity aggregate, and a rendering engine that presents a representation of the generated summary..

87.     The '761 Patent solves the technological problem that exists when a system attempts to quantify and monitor usage of a SaaS system.  Once an application is migrated to the cloud, via, for instance, the method of the '136 Patent, "it is desirable to measure and/or meter each user's use of any applications and each application's use of cloud resources." '761 Patent at 3:56-59. "This metering can be used to charge individual users and/or groups of users for the cost of cloud resources actually consumed by the users rather than based on storage limits, time limits, processor limits, or other forms of block billing." *Id.* at 3:59-63.  Metering "can also be used to charge individual users of the same

application separately, rather than block billing." *Id.* at 3:63-66. "This is beneficial because it allows cost sensitive users greater control over the cost of cloud base applications, and allows cloud operators to more efficiently assign and bill for available resources." *Id.* at 3:66-4:2. The '761 Patent effectuates these goals, by, for instance, using systems that can identify the resources that individual users consume.

88.    For example, claim 1 of the '761 Patent is directed to:

A system for measuring a usage event of at least one computer resource within a
   multi-tenant system, comprising:

a metering engine configured to monitor a plurality of data streams generated by
   monitored events of the multi-tenant system;

an identity engine configured to identify a first user who initiated an event
   captured by a portion of the plurality of data streams from a group of users
   as first user instances uniquely mapped to the first user;

a bucket aggregator configured to aggregate activity from the first user instances
   to create a total activity aggregate of the first user comprising monitored
   events;

a subscription engine configured to generate a summary of the total activity
   aggregate of the first user and a total activity aggregate of all instances that
   belong to a same zone as the first user;

a rendering engine that presents a representation of the generated summary of the
   total activity aggregate of the first user and the total activity aggregate of
   all instances that belong to a same zone as the first user to a user interface;

wherein the metering engine, the identity engine, the bucket aggregator, the
   subscription engine, and the rendering engine comprise stored program
   instructions embedded in a non-transitory computer readable storage
   medium, and

wherein the stored program instructions are executed by a computer processor to
   execute a function.

## IV.     MICROSOFT'S CLOUD PRODUCTS USE CORENT'S PATENTED TECHNOLOGY

89.     Corent restates and realleges the preceding paragraphs of this Complaint. On information and belief, Microsoft manufactures, uses, tests, markets, offers for sale, sells, and/or imports in or into the United States software for migration services, cloud orchestration, agile database connector enables SaaS database systems, and metering systems.

90.     Hereafter, the term "Accused Products" refers to all products manufactured, used, tested, imported, or sold by or on behalf of Microsoft that embody the systems and devices claimed by the Asserted Patents and all processes employed by Microsoft that practice the methods claimed by the Asserted Patents, consisting of at least: Microsoft Azure, Microsoft Azure Migrate, Microsoft Azure Kubernetes Service, Azure Marketplace, Azure Monitoring, and Azure SQL Database.  On information and belief, Microsoft offers to sell and sells software that allows their customers to utilize infringing functionalities.

91.     Microsoft is a leading purveyor of cloud computing technologies, including cloud migration services and workload management systems.  Microsoft Azure and AKS are both among the largest web migration and orchestration management systems on the market.

92.     Microsoft began its business in the computer operating system market.  As technology evolved, Microsoft faced growing competition from other software providers, such as Amazon Web Services, which had already established a strong foothold in the cloud computing market.  Microsoft realized that it could better utilize its products in the cloud and transitioned to cloud computing.  Microsoft Azure, Microsoft's flagship cloud services system, was launched in 2010.

93.     On information and belief, despite Microsoft's size and other software offerings, Microsoft found that companies struggled to adopt cloud solutions because they, in part, lacked visibility into the cloud environment and the tight inter-dependencies between applications, workloads, and data.  Without that visibility, companies had

difficulty planning and organizing migration strategies. To overcome these challenges, Microsoft announced and introduced Azure Migrate in 2017.[23]

94.    On information and belief, Azure Migrate expanded new customer opportunities for Microsoft. Microsoft offers it as a free feature to encourage potential Azure customers to move their software to the cloud and into the Azure ecosystem, thus enabling Microsoft to sell its other cloud offerings.

95.    According to Microsoft, Azure Migrate allowed for the discovery and assessment of on-premises virtual machines, inbuilt dependency mapping for high-confidence discovery of multi-tier applications, intelligent rightsizing Azure virtual machines, compatibility reporting with guidelines for remediating potential issues, and integration with Azure Database migration services for database recovery and migration.[24]

96.    Azure Migrate has three general phases: deciding, planning, and execution.

97.    In the decision phase, the on-premises architecture of a potential migration target is identified and inventoried.

98.    During the planning phase, workloads of the application are identified and grouped into partitions. These partitions and workloads are analyzed based on, amongst other things, their dependencies.



---

[23] https://azure.microsoft.com/en-us/blog/announcing-azure-migrate/ (last accessed on September 19, 2025)
[24] https://azure.microsoft.com/en-us/blog/announcing-azure-migrate/ (last accessed on September 19, 2025)

99.     Based on this analysis, a series of targeted mappings are created and analyzed. Once a most favorable mapping is determined, the migration is executed via replication, testing, and, finally, activation.[25]

100.     On information and belief, Microsoft is aware of Corent's software offerings and patents, and even acts a broker for some of Corent's systems through its Microsoft Azure platform.   Specifically, Microsoft advertises Corent's product offerings, and is therefore aware of Corent's website (which includes, and has included from before the filing of this Complaint, a disclosure of Corent's patents, including the Asserted Patents, covering its products – the same products that Microsoft offers on its Azure platform). Additionally, Corent has discussed the Asserted Patents and the functionality of Corent products with Microsoft in various meetings with Microsoft's product team dating back approximately four years ago.  For example, Mr. Syed has met with Jeremy Winter, the Chief Product Officer and CVP of Azure Core, and discussed both Corent's patents and Corent's product line.

101.     While Microsoft charges a fee for Corent's migration services, it offers the Microsoft Azure Migration service to customers for free for the first 180 days.  By offering its Azure Migrate services for free through its Azure platform, Microsoft undercuts Corent's licensing and pricing model.  Microsoft also leverages Azure Migrate (as a free offering) to sell other Microsoft products to customers who might otherwise purchase licenses from Corent.  Below is a screenshot of Microsoft's published price lists.[26]

---

[25] https://learn.microsoft.com/en-us/azure/migrate/migrate-services-overview?view=migrate-classic (last accessed on September 19, 2025)
[26] https://azure.microsoft.com/en-us/pricing/details/azure-migrate/ (last accessed on September 19, 2025)

| Tool | Scenario | Pricing |
|---|---|---|
| Azure Migrate | Server Assessment and Migration | Free¹ |
|  | Database Assessment and Migration | Free² |
|  | Web App Assessment and Migration | Free |
| Carbonite | Server Migration | Get License › |
| Cloudamize | Server Assessment | Get License › |
| Corent | Server Assessment and Migration | Get License › |
| Device42 | Server Assessment | Get License › |
| HashiCorp Terraform | Azure Landing Zones | Get License › |
| Lakeside | Virtual Desktop Infrastructure Assessment | Get License › |
| Rackware | Server Migration | Get License › |
| Turbonomic | Server Assessment | Get License › |
| UnifyCloud | Server Assessment and Migration Database Assessment | Get License › |

102.   Beyond Azure Migrate, Microsoft infringes the Asserted Patents in other ways.

103.   Kubernetes is a container orchestration system.   Kubernetes works on the principle of containerization.  Workloads of an application are containerized and grouped together, via a partitioning process.[27]



104.   Kubernetes automatically assigns these workloads and partitions, based on the results of the Kube Scheduler, to cloud resources.  This automatic assignment is effectuated by filtering, scoring, and mapping functionality.  Without the Kube Scheduler, Kubernetes (including Kubernetes offered through AKS) cannot effectively utilize cloud resources,

---

[27] https://www.workloadautomation-community.com/blogs/automate-container-orchestration-with-the-new-kubernetes-plugin-in-workload-automation (last accessed on September 19, 2025)

because it would not know where to assign workloads and partitions of workloads. Instead, it would randomly assign those jobs, which would lower the overall efficacy of the system.[28]



105. Shortly after introducing Azure Migrate, Microsoft also introduced AKS.[29] On information and belief, AKS was meant to further integrate companies into the Azure ecosystem.

106. Like Azure Migrate, AKS is offered, at least in part, for free in order to promote adoption of the Azure ecosystem. Instead of charging for the orchestration power of Kubernetes, Microsoft advertises that customers only pay for the virtual machines, e.g., cloud resources, that Microsoft also offers.

107. Microsoft offers its own scheduler features and best practices that add on to the base Kubernetes scheduler that allow for further optimization.[30]

---

[28] https://www.alibabacloud.com/blog/getting-started-with-kubernetes-%7C-scheduling-process-and-scheduler-algorithms_596299 (last accessed on September 19, 2025)

[29] https://azure.microsoft.com/en-us/blog/introducing-azure-container-service-aks-managed-kubernetes-and-azure-container-registry-geo-replication/#:~:text=*%20Published%20Oct%2024%2C%202017.%20*%203%20min%20read (last accessed on September 19, 2025)

[30] https://learn.microsoft.com/en-us/azure/aks/operator-best-practices-scheduler (last accessed on September 19, 2025)

[30] https://learn.microsoft.com/en-us/azure/aks/core-aks-concepts (last accessed on September 19, 2025)

28



108.   The fundamental migration and orchestration technologies that underly the success of Microsoft's Azure Migrate and AK S were developed and patented by Corent.

109.   In addition to providing migration and managed orchestration services, Microsoft provides metering services that can meter usage of Azure cloud services through the Azure Marketplace. The Marketplace metering services allow customers to create managed plans for Azure application offerings that are charged according to usage.[31]  Azure Marketplace advertises that its metering systems allow for individual attribution of usage of Azure resources.[32]

110.   Azure's Marketplace also allows for the measurement, overview, and analysis of individual customer usage of cloud applications.

---

[31] https://learn.microsoft.com/en-us/partner-center/marketplace-offers/azure-app-metered-billing (last accessed on September 19, 2025)

[32] https://learn.microsoft.com/en-us/partner-center/marketplace-offers/azure-partner-customer-usage-attribution (last accessed on September 19, 2025)

111.    Azure Marketplace allows for SaaS operators to measure customer engagement, subscriptions, and usage.[33]  The usage system allows for measurement of how containers, SaaS, virtual machines, and other cloud components are actually used by customers.[34]  Azure Marketplace's metered usage allows for the production of Meter ID's which allow for the identification of customers, the measurement of their usage, and the comparison of that usage against other customers, units, and zones.[35]



112.    Like Marketplace, which can measure container usage, other Microsoft metric tools allow for the metering of multi-tenant systems, including AKS.  Through Azure Monitor and Traffic Analytics, Microsoft offers monitoring of a variety of services, including AKS multi-tenant activity monitoring.

---

[33] https://learn.microsoft.com/en-us/partner-center/insights/summary-dashboard (last accessed on September 19, 2025)

[34] https://learn.microsoft.com/en-us/partner-center/insights/usage-dashboard (last accessed on September 19, 2025)

[35] https://learn.microsoft.com/en-us/partner-center/insights/usage-metered-dashboard (last accessed on September 19, 2025)

113.   On information and belief, Azure Monitor and Traffic Analytics enable the monitoring of, amongst other things, platform metrics, which allow for the creation of metric alerts, Prometheus metrics, activity logs (which collect and monitor activity across the AKS system), and resource logs (which analyze the logs by queries and sets up alerts based on log information).  These different metrics and logs are all collected and monitored by Azure Monitor and Traffic Analysis.



114.   On information and belief, AKS metrics can be individually defined, stored in the Azure Monitor database, are lightweight and capable of supporting near real-time alerting, and can be used to track the performance of resources and users over time.[36]  These systems may be used to track tenant usage and meter multi-tenant systems.

---

[36] https://learn.microsoft.com/en-us/azure/aks/monitor-aks?tabs=cilium (last accessed on September 19, 2025)



115.    But Microsoft did not develop these metering systems and methods.  These metering systems and methods were first developed by and disclosed in Corent's metering patents.

116.    Both Azure Marketplace and AKS infringe Corent's metering patents.

117.    Microsoft also offers the Azure SQL Database.  SQL Database was first released in 2017.[37]

118.    Prior database systems allowed for some stand-alone single tenant applications with only a single tenant database to be deployed for multiple tenants.  While this pattern provided the greatest tenant isolation, it is expensive because there is no opportunity to share resources.

119.    On information and belief, Azure SQL Database allows for the more efficient use of resources through two different SaaS database infrastructures, the database-per-tenant infrastructure and the sharded multi-tenant database.

---

[37] https://azure.microsoft.com/en-us/blog/new-multi-tenant-patterns-for-building-saas-applications-on-sql-database/ (last accessed on September 19, 2025)

32

120.   The database-per-tenant model is effective for service providers that both desire tenant isolation but also wish to run a centralized service that allows cost-efficient use of shared resources—e.g., the advantages of cloud computing.   In this model, a database is created for each tenant, and all databases are centrally managed.   These databases can be hosted in elastic pools to provide cost-efficient and easy performance management, which both leverage the unpredictable usage patterns of database tenants.  A catalog database holds the mapping between tenants and their databases, which is managed using shard map management features.



121.   Sharded multi-tenant databases are effective for service providers who seek to use a lower cost and simpler management with reduced tenant isolation. This model allows packing large numbers of tenants into a single database, driving the cost-per-tenant down.

122.   A comparison of the metrics of the SaaS models above shows the relative benefits of the sharded multi-tenant and database per tenant infrastructures.

| | Standalone App | Database per tenant | Sharded Multi-tenant |
|---|---|---|---|
| Scale | High 1-1000s | Very high 1-100,000s | Unlimited 1-1,000,000s |
| Database cost–per tenant | High (sized for peaks) | Low (using pools) | Lowest (small tenants) |
| Tenant isolation | Very High | High | Low (high for singletons) |
| Performance monitoring/mgmt. | Per-tenant | Aggregate + per-tenant | Aggregate, per-tenant for singletons only |
| Restore single tenant | Easy | Easy | Hard (easy for singletons) |
| Disaster recovery (all tenants) | Moderate Many components to recover | Moderate Patterns address complexity at scale | Easy (for multi-tenant dbs) Patterns address singleton complexity at scale |
| Development complexity | Low | Low | Medium (sharding) |
| Operational complexity | Medium-High Individually simple, complex at scale | Low-Medium Patterns address complexity at scale | Low-High Individual tenant management is complex |
| Per-tenant customization | Easy | Easy | Complex |

123.   Both the sharded multi-tenant and database-per-tenant systems offered by Azure SQL Database infringe functionalities disclosed in Corent's agile database connector patents.

124.   The Azure SQL Database system offers the same benefits—multi-tenant use that is scalable and lowers cost—in the same way—through the use of an agile database connector—as Corent's agile database connector patents.

125.   But Microsoft did not create the invention that is practiced by the Azure SQL Database.  That architecture and methods of using that architecture were first disclosed in Corent's agile database connector patents.

V.    **MICROSOFT'S UNLICENSED USE OF CORENT'S PATENTED INVENTIONS HAS HARMED AND CONTINUES TO HARM CORENT**

126.   On information and belief, Microsoft unfairly leverages its dominant market position to undercut competitors like Corent.

127.   On information and belief, Microsoft reaps large profits from its Azure Migrate, Azure Marketplace, Azure SQL Database, and AKS.

128.   Azure Migrate and AKS directly compete with Corent's SurPaaS MaaS and SaaSOps technology offerings.

129.   On information and belief, because Azure Migrate and AKS are offered, at least in part, for free to Azure customers they undercut competing technologies, like Corent's.

130.   This is particularly meaningful when, like here, the products are offered in order to entice customers to integrate their software with a larger ecosystem, which later monetizes that usage.

131.   Because Corent is a smaller, more focused company, without its own data centers or cloud infrastructure, it cannot offer the fruits of its intellectual labor for free.

132.   On information and belief, Microsoft, however, can offer these same services, for which it does not own the patents, for free because (1) it did not incur the large investments necessary to revolutionize this technology (Corent did) and (2) allowing customers to use these services for free entices them to enter into the larger Azure ecosystem and pay for other Microsoft services, often on an annual recurring basis. Microsoft then monetizes customers' usage of paid services and generates enormous profits.  Because Microsoft's profit is generated across the Azure ecosystem, and not just through the individual functionalities such as Azure Migrate, Microsoft is able to obtain a significant competitive edge.

133.   On information and belief, Microsoft reaps large benefits from its Azure Marketplace and SQL Database systems, which similarly infringe Corent's patents.  This infringement is doubly harmful to Corent because customers use these Azure systems only after they are enticed to join the Azure ecosystem via Microsoft's free offerings.

134.   On information and belief, without offering its AKS and Migrate systems for free (at least in part), Microsoft would not be able to entice customers to use its expensive follow-on services, like Azure Marketplace and SQL Database.

135.   This integration and leveraging of technology developed by Corent harms Corent by unfairly undercutting Corent's licensing strategy and unfairly steering customers away from Corent.

136.    Corent experiences damages in both the loss of licensing fees as well as the loss of customer base through Microsoft's unfair actions.  Corent's growth and market reputation have also been harmed by Microsoft's infringement and unfair competition.

## FIRST CAUSE OF ACTION

### (Infringement of the '136 Patent)

137.    Corent restates and realleges the preceding paragraphs of this Complaint.

138.    Microsoft has been on notice and aware of the '136 Patent and a specific factual basis for its infringement of the '136 Patent from prior to the filing of this Complaint.  On information and belief, Microsoft has not taken any action to stop its infringement.

139.    Microsoft has, under 35 U.S.C. § 271(a), directly infringed, and continues to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including without limitation at least claim 1 of the '136 Patent, by making, using, testing, selling, leasing, offering for sale, and/or importing hardware and/or software for performing a method for configuring workloads, for example, comprising identifying workloads of a non-tenant-aware application and a set of application characteristics for each of the identified workloads; creating a partition of the workloads in reference to a partition application characteristic; grouping the created partition of the workloads into a plurality of workload sub-partitions as a function of a common workload characteristic; assigning each partition of the workloads to a set of cloud resources as a function of the partition application characteristic and a characteristic of the set of cloud resources; constructing a plurality of workload assignment maps to assign to each of the workloads in accordance with the created partition, and ranking each one of plurality of workload assignment maps based on a set of rules.  An exemplary claim chart concerning one way in which Microsoft infringes claim 1 of the '136 Patent is attached as Exhibit 5.

140.    Microsoft has also indirectly infringed, and continues to indirectly infringe, the '136 Patent under 35 U.S.C. §§ 271(b) and (c).

141.   Microsoft has willfully, knowingly, and intentionally actively aided, abetted, and induced others to directly infringe at least claim 1 of the '136 Patent under 35 U.S.C. § 271(b) (such as its customers in this District and throughout the United States), and continues to do so, by, for example, selling, offering for sale, and encouraging its customers in this District and throughout the United States to use its Accused Products in an infringing manner by providing information and technical support, including in promotional materials, product manuals, brochures, videos, demonstrations, and website materials.

142.   Microsoft contributes to the direct infringement of at least claim 1 of the '136 Patent under 35 U.S.C. § 271(c) by, for example, supplying, with knowledge of the '136 Patent, a material part of a claimed invention, where the material part is not a staple article of commerce and is incapable of substantial non-infringing use.  For example, Defendant provides, owns, operates, sells, offers to sell, leases, and/or imports various hardware and software for performing a method for configuring workloads, comprising identifying workloads of a non-tenant-aware application and a set of application characteristics for each of the identified workloads; creating a partition of the workloads in reference to a partition application characteristic; grouping the created partition of the workloads into a plurality of workload sub-partitions as a function of a common workload characteristic; assigning each partition of the workloads to a set of cloud resources as a function of the partition application characteristic and a characteristic of the set of cloud resources; constructing a plurality of workload assignment maps to assign to each of the workloads in accordance with the created partition, and ranking each one of plurality of workload assignment maps based on a set of rules (such as that shown in Exhibit 5) that are not a staple article of commerce and are incapable of substantial non-infringing use.

143.   Microsoft's ongoing infringement is willful in view of the above, and its failure to take any action, even after being put on notice, to stop its infringement or inducement of, or contribution to, infringement by others.

## SECOND CAUSE OF ACTION

### (Infringement of the '893 Patent)

144.    Corent restates and realleges the preceding paragraphs of this Complaint.

145.    Microsoft has been on notice and aware of the '893 Patent and a specific factual basis for its infringement of the '893 Patent from prior to the filing of this Complaint.   On information and belief, Microsoft has not taken any action to stop its infringement.

146.    Microsoft has, under 35 U.S.C. § 271(a), directly infringed, and continues to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including without limitation at least claim 1 of the '893 Patent, by making, using, testing, selling, leasing, offering for sale, and/or importing hardware and/or software for a system for configuring workloads, comprising: a scanning engine configured to identify workloads of a non-tenant-aware application and a set of application characteristics for each of the identified workloads using workload rules in a workload partitioner rules database defined by an administrator user; a partitioning engine configured to group the workloads to a smaller set of partitions as a function of common characteristics of workloads in a partition using partition rules in a partition mapper rules database defined by an administrator user; a mapping engine configured to assign each partition of the workloads to a set of cloud resources as a function of a partition application characteristic and a characteristic of the set of cloud resources, wherein each partition is assigned to a discrete cloud resource using partition rules in the partition mapper rules database as applied to a cloud resource database defined by an administrator user; and a rendering engine that constructs a migration plan to migrate each of the workloads to the set of cloud resources in accordance with the assigned partitions from the mapping engine; wherein the scanning engine, the partitioning engine, the mapping engine, and the rendering engine comprise stored program instructions embedded in a non-transitory computer readable storage medium, and wherein the stored program instructions are executed by a computer processor to execute a function.  An

exemplary claim chart concerning one way in which Microsoft infringes claim 1 of the '893 Patent is attached as Exhibit 6.

147.   Microsoft has also indirectly infringed, and continues to indirectly infringe, the '893 Patent under 35 U.S.C. §§ 271(b) and (c).

148.   Microsoft has willfully, knowingly, and intentionally actively aided, abetted, and induced others to directly infringe at least claim 1 of the '893 Patent under 35 U.S.C. § 271(b) (such as its customers in this District and throughout the United States), and continues to do so, by, for example, selling, offering for sale, and encouraging its customers in this District and throughout the United States to use its Accused Products in an infringing manner by providing information and technical support, including in promotional materials, product manuals, brochures, videos, demonstrations, and website materials.

149.   Microsoft contributes to the direct infringement of at least claim 1 of the '893 Patent under 35 U.S.C. § 271(c) by, for example, supplying, with knowledge of the '893 Patent, a material part of a claimed invention, where the material part is not a staple article of commerce and is incapable of substantial non-infringing use.  For example, Microsoft provides, owns, operates, sells, offers to sell, leases, and/or imports various hardware and software for a system for configuring workloads, comprising: a scanning engine configured to identify workloads of a non-tenant-aware application and a set of application characteristics for each of the identified workloads using workload rules in a workload partitioner rules database defined by an administrator user; a partitioning engine configured to group the workloads to a smaller set of partitions as a function of common characteristics of workloads in a partition using partition rules in a partition mapper rules database defined by an administrator user; a mapping engine configured to assign each partition of the workloads to a set of cloud resources as a function of a partition application characteristic and a characteristic of the set of cloud resources, wherein each partition is assigned to a discrete cloud resource using partition rules in the partition mapper rules database as applied to a cloud resource database defined by an administrator user; and a rendering engine that constructs a migration plan to migrate each of the workloads to the set of cloud

resources in accordance with the assigned partitions from the mapping engine; wherein the scanning engine, the partitioning engine, the mapping engine, and the rendering engine comprise stored program instructions embedded in a non-transitory computer readable storage medium, and wherein the stored program instructions are executed by a computer processor to execute a function (such as that shown in Exhibit 6) that are not a staple article of commerce and are incapable of substantial non-infringing use.

150.   Microsoft's ongoing infringement is willful in view of the above, and its failure to take any action, even after being put on notice, to stop its infringement or inducement of, or contribution to, infringement by others.

## THIRD CAUSE OF ACTION

## (Infringement of the '372 Patent)

151.   Corent restates and realleges the preceding paragraphs of this Complaint.

152.   Microsoft has been on notice and aware of the '372 Patent and a specific factual basis for its infringement of the '372 Patent from prior to the filing of this Complaint.   On information and belief, Microsoft has not taken any action to stop its infringement.

153.   Microsoft has, under 35 U.S.C. § 271(a), directly infringed, and continues to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including without limitation at least claim 1 of the '372 Patent, by making, using, testing, selling, leasing, offering for sale, and/or importing hardware and/or software for a computer processor implemented system that facilitates concurrent, multi-session use of a non-tenant aware application by first and second tenants to access at least a first non-tenant aware data repository, utilizing unique tenant identifiers obtained from a tenant-aware non-application source, without requiring modification of the non-tenant aware application or the first non-tenant aware data repository, comprising: an agile database connector configured to infer unique tenant identifiers from the tenant-aware non-application source, where the agile database connector has: a translator logically disposed between (a) the first non-tenant aware data repository and (b) the application, and configured to translate at least

first and second non-tenant specific data access commands received from the application into first and second tenant-specific data access commands, respectively, using the inferred unique tenant identifiers; and a handler separate from the non-application source, the handler logically disposed between (a) the first non-tenant aware data repository and (b) the application, and configured to pass the first and second tenant-specific data access commands to the first data repository, respectively; wherein first and second tenant-specific outputs from the first non-tenant aware data repository are forwarded to the application without passing back through the translator and handler, and wherein the tenant-aware non-application source is external to the non-tenant aware application and the non-tenant aware data repository.  An exemplary claim chart concerning one way in which Microsoft infringes claim 1 of the '372 Patent is attached as Exhibit 7.

154.  Microsoft has also indirectly infringed, and continues to indirectly infringe, the '372 Patent under 35 U.S.C. §§ 271(b) and (c).

155.  Microsoft has willfully, knowingly, and intentionally actively aided, abetted, and induced others to directly infringe at least claim 1 of the '372 Patent under 35 U.S.C. § 271(b) (such as its customers in this District and throughout the United States), and continues to do so, by, for example, selling, offering for sale, and encouraging its customers in this District and throughout the United States to use its Accused Products in an infringing manner by providing information and technical support, including in promotional materials, product manuals, brochures, videos, demonstrations, and website materials.

156.  Microsoft contributes to the direct infringement of at least claim 1 of the '372 Patent under 35 U.S.C. § 271(c) by, for example, supplying, with knowledge of the '372 Patent, a material part of a claimed invention, where the material part is not a staple article of commerce and is incapable of substantial non-infringing use.  For example, Microsoft provides, owns, operates, sells, offers to sell, leases, and/or imports various hardware and software for a computer processor implemented system that facilitates concurrent, multi-session use of a non-tenant aware application by first and second tenants to access at least a first non-tenant aware data repository, utilizing unique tenant identifiers obtained from a

tenant-aware non-application source, without requiring modification of the non-tenant aware application or the first non-tenant aware data repository, comprising: an agile database connector configured to infer unique tenant identifiers from the tenant-aware non-application source, where the agile database connector has: a translator logically disposed between (a) the first non-tenant aware data repository and (b) the application, and configured to translate at least first and second non-tenant specific data access commands received from the application into first and second tenant-specific data access commands, respectively, using the inferred unique tenant identifiers; and a handler separate from the non-application source, the handler logically disposed between (a) the first non-tenant aware data repository and (b) the application, and configured to pass the first and second tenant-specific data access commands to the first data repository, respectively; wherein first and second tenant-specific outputs from the first non-tenant aware data repository are forwarded to the application without passing back through the translator and handler, and wherein the tenant-aware non-application source is external to the non-tenant aware application and the non-tenant aware data repository (such as that shown in Exhibit 7) that are not a staple article of commerce and are incapable of substantial non-infringing use.

157.    Microsoft's ongoing infringement is willful in view of the above, and its failure to take any action, even after being put on notice, to stop its infringement or inducement of, or contribution to, infringement by others.

### **FOURTH CAUSE OF ACTION**

### **(Infringement of the '761 Patent)**

158.    Corent restates and realleges the preceding paragraphs of this Complaint.

159.    Microsoft has been on notice and aware of the '761 Patent and a specific factual basis for its infringement of the '761 Patent from prior to the filing of this Complaint.  On information and belief, Microsoft has not taken any action to stop its infringement.

160.    Microsoft has, under 35 U.S.C. § 271(a), directly infringed, and continues to directly infringe, literally and/or under the doctrine of equivalents, one or more claims,

including without limitation at least claim 1 of the '761 Patent, by making, using, testing, selling, leasing, offering for sale, and/or importing hardware and/or software for a system for measuring a usage event of at least one computer resource within a multi-tenant system, comprising: a metering engine configured to monitor a plurality of data streams generated by monitored events of the multi-tenant system; an identity engine configured to identify a first user who initiated an event captured by a portion of the plurality of data streams from a group of users as first user instances uniquely mapped to the first user; a bucket aggregator configured to aggregate activity from the first user instances to create a total activity aggregate of the first user comprising monitored events; a subscription engine configured to generate a summary of the total activity aggregate of the first user and a total activity aggregate of all instances that belong to a same zone as the first user; a rendering engine that presents a representation of the generated summary of the total activity aggregate of the first user and the total activity aggregate of all instances that belong to a same zone as the first user to a user interface; wherein the metering engine, the identity engine, the bucket aggregator, the subscription engine, and the rendering engine comprise stored program instructions embedded in a non-transitory computer readable storage medium, and wherein the stored program instructions are executed by a computer processor to execute a function.  An exemplary claim chart concerning one way in which Microsoft infringes claim 1 of the '761 Patent is attached as Exhibit 8.

161.   Microsoft has also indirectly infringed, and continues to indirectly infringe, the '761 Patent under 35 U.S.C. §§ 271(b) and (c).

162.   Microsoft has willfully, knowingly, and intentionally actively aided, abetted, and induced others to directly infringe at least claim 1 of the '761 Patent under 35 U.S.C. § 271(b) (such as its customers in this District and throughout the United States), and continues to do so, by, for example, selling, offering for sale, and encouraging its customers in this District and throughout the United States to use its Accused Products in an infringing manner by providing information and technical support, including in promotional materials, product manuals, brochures, videos, demonstrations, and website materials.

163.    Microsoft contributes to the direct infringement of at least claim 1 of the '761 Patent under 35 U.S.C. § 271(c) by, for example, supplying, with knowledge of the '761 Patent, a material part of a claimed invention, where the material part is not a staple article of commerce and is incapable of substantial non-infringing use.  For example, Microsoft provides, owns, operates, sells, offers to sell, leases, and/or imports various hardware and software for a system for measuring a usage event of at least one computer resource within a multi-tenant system, comprising: a metering engine configured to monitor a plurality of data streams generated by monitored events of the multi-tenant system; an identity engine configured to identify a first user who initiated an event captured by a portion of the plurality of data streams from a group of users as first user instances uniquely mapped to the first user; a bucket aggregator configured to aggregate activity from the first user instances to create a total activity aggregate of the first user comprising monitored events; a subscription engine configured to generate a summary of the total activity aggregate of the first user and a total activity aggregate of all instances that belong to a same zone as the first user; a rendering engine that presents a representation of the generated summary of the total activity aggregate of the first user and the total activity aggregate of all instances that belong to a same zone as the first user to a user interface; wherein the metering engine, the identity engine, the bucket aggregator, the subscription engine, and the rendering engine comprise stored program instructions embedded in a non-transitory computer readable storage medium, and wherein the stored program instructions are executed by a computer processor to execute a function.  (such as that shown in Exhibit 8) that are not a staple article of commerce and are incapable of substantial non-infringing use.

164.    Microsoft's ongoing infringement is willful in view of the above, and its failure to take any action, even after being put on notice, to stop its infringement or inducement of, or contribution to, infringement by others.

## **PRAYER FOR RELIEF**

WHEREFORE, Corent prays for judgment against Microsoft as follows:

44

A.     That Microsoft has infringed each of the Asserted Patents, and unless enjoined, will continue to infringe one or more of the applicable Asserted Patents;

B.     That Microsoft's infringement of one or more of the applicable Asserted Patents has been willful;

C.     That Microsoft pay Corent's damages adequate to compensate Corent for Microsoft's past, present, and future infringement of each of the Asserted Patents, together with interest and costs under 35 U.S.C. § 284;

D.     That Microsoft pay Corent pre-judgment and post-judgment interest on the damages assessed;

E.     That Microsoft pay Corent enhanced damages pursuant to 35 U.S.C. § 284;

F.     That Microsoft be enjoined from infringing the Asserted Patents, or if its infringement is not enjoined, that Microsoft be ordered to pay ongoing damages to Corent for any post-judgment infringement of the applicable Asserted Patents;

G.     That this is an exceptional case under 35 U.S.C. § 285;

H.     That Microsoft pay Corent's attorneys' fees and costs in this action; and

I.     That Corent be awarded such other and further relief, including equitable relief, as this Court deems just and proper.

45

## REQUEST FOR A TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Corent hereby demands a trial by jury on all issues triable to a jury.

Dated this 26th day of September 2025

/s/ Matthew Berkowitz

Matthew G. Berkowitz (SBN 310426)
Patrick Colsher (SBN 336958)
Caroline M. Walters (SBN 239054)
Jeff Leung (SBN 310960)
Timothy A. Trost (SBN 340843)
Alexander A. Williams (SBN 362748)
Reichman Jorgensen Lehman & Feldberg LLP
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
Tel: (650) 623-1401
mberkowitz@reichmanjorgensen.com
pcolsher@reichmanjorgensen.com
cwalters@reichmanjorgensen.com
jleung@reichmanjorgensen.com
ttrost@reichmanjorgensen.com
awilliams@reichmanjorgensen.com